# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

**ERICA UMANA**
c/o Murphy, Falcon & Murphy, P.A
1 South Street, Suite 3000
Baltimore, MD 21202

and

**ERIKA ERAZO SANCHEZ**
c/o Murphy, Falcon & Murphy, P.A
1 South Street, Suite 3000
Baltimore, MD 21202

and

**DAYRI AMAYA BENITEZ**
c/o Murphy, Falcon & Murphy, P.A
1 South Street, Suite 3000
Baltimore, MD 21202

and

**BRANDON CUEVAS**
c/o Murphy, Falcon & Murphy, P.A
1 South Street, Suite 3000
Baltimore, MD 21202

   *Plaintiffs,*

v.

**PRINCE GEORGE'S COUNTY, MARYLAND**
Wayne Curry Administration Building
1301 McCormick Drive
Largo, Maryland 20774

   Serve on:  Rhonda L. Weaver
         County Attorney
         1301 McCormick Drive
         Suite 4100
         Largo, Maryland 20774

and

Case No. _____

**JASON BALL**
Individually and in his official capacity
as a Prince George's County Police Officer

   Serve on:  Malik Aziz
         Chief of Police
         Prince George's County
         Police Department
         8801 Police Plaza
         Upper Marlboro, Maryland 20772

and

**JOSEPH MIHANDA**
Individually and in his official capacity
as a Prince George's County Police Officer

   Serve on:  Malik Aziz
         Chief of Police
         Prince George's County
         Police Department
         8801 Police Plaza
         Upper Marlboro, Maryland 20772

and

**ANTHONY JACKSON**
Individually and in his official capacity
as a Prince George's County Police Officer

   Serve on:  Malik Aziz
         Chief of Police
         Prince George's County
         Police Department
         8801 Police Plaza
         Upper Marlboro, Maryland 20772

   *Defendants*

## COMPLAINT AND DEMAND FOR JURY TRIAL

   Plaintiffs Erica Umana, Erika Erazo Sanchez, Dayri Amaya Benitez, and Brandon Cuevas

(collectively, "Plaintiffs"), by and through undersigned counsel, hereby file this Complaint against

Defendants Prince George's County, Maryland, Corporal Jason Ball #3396, Police Officer First

Class Joseph Mihanda #4141, and Corporal Anthony Jackson #2963 (collectively, "Defendants"), and state as follows:

## INTRODUCTION

1.      On June 2, 2021, Prince George's County police officers Jason Ball, Joseph Mihanda, and Anthony Jackson maliciously and illegally broke into Plaintiffs' apartment without a warrant, or any exception to the warrant requirement, in direct violation of Plaintiffs' 4th Amendment rights.

2.      These officers then further violated Plaintiffs' rights by unlawfully pointing guns and tasers at them, threatening physical violence against them, assaulting them, falsely detaining them, and ultimately killing Plaintiff Umana's pet dog unnecessarily, right in front of them.

3.      To add insult to sheer injury, these officers then falsely arrested and detained Plaintiffs for over an hour even though none of them had committed any crime.

4.      For over 50 years, Prince George's County government has condoned the widespread brutality and misconduct inflicted by its police officers against County residents, refusing to implement effective training, oversight, or disciplinary measures to prevent its officers from committing illegal and unconstitutional actions.

5.      Prince George's County Police Department ("PGPD") leaders knew or should have known that their officers would likely commit these civil rights violations without proper training, oversight, and discipline, but they simply did not care enough to protect the rights of the community against police misconduct.

6.      This lawsuit is yet another tragically foreseeable outcome of a failed and biased system of policing in Prince George's County, to which County leadership has continually turned a blind eye.

7.    As a result, Plaintiffs have been irreparably damaged due to Prince George's County government's unacceptable apathy. Plaintiffs have suffered and will continue to suffer from mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

## PARTIES JURISDICTION AND VENUE

8.    Plaintiffs Erica Umana ("Ms. Umana"), Erika Erazo Sanchez ("Ms. Sanchez"), Dayri Amaya Benitez ("Ms. Benitez"), and Brandon Cuevas ("Mr. Cuevas") are Latin-America adults who reside in Maryland.

9.    Defendant Prince George's County, Maryland ("County") is a municipal corporation organized under the provisions of Art. XI-A of the Maryland Constitution. At all times relevant hereto, Defendant County, through its final policymakers with final policymaking authority, including but not limited to the Chief of PGPD Malik Aziz ("Chief Aziz"), agents, servants, and employees, hired, supervised, trained, and employed Defendants Jason Ball, Joseph Mihanda, Anthony Jackson (collectively "Officer Defendants"), and the entire PGPD police force. By virtue of its status as a governmental entity that exercised power delegated by the State of Maryland, the County acted under the color of state law when it hired, trained, supervised, and retained Officer Defendants and its entire police force. The County is a "person" under 42 U.S.C. §1983 and is not immune under the Eleventh Amendment.

10.    Defendants Jason Ball, Joseph Mihanda, and Anthony Jackson are Prince George's County Police Officers employed by Defendant County as sworn police officers of the PGPD. Upon information and belief, Officer Defendants currently reside within the State of Maryland.

11.     This Complaint contains claims arising under the Fourth and Fourteenth Amendments to the United States Constitution and asserts claims for relief pursuant to 42 U.S.C. § 1983, the Maryland Constitution, and claims under Maryland State law.

12.     Jurisdiction of this Court arises under 28 U.S.C. § 1343 and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because the events, acts, and omissions complained of herein all occurred within this District.

14.     Plaintiffs have satisfied all conditions precedent necessary to the filing of these claims.

## FACTS OF THE CASE

15.     On June 2, 2021, Defendant Ball responded to 6908 Allison Street in Prince George's County for a report of an alleged dog bite that occurred at The Verona at Landover Hills apartment complex.

16.     The dogs alleged to have been involved in the bite incident belonged to Ms. Umana and Ms. Benitez.

17.     Upon his arrival, Defendant Ball saw Ms. Sanchez, who was sitting on the steps by herself in front of her apartment building.

18.     Defendant Ball approached Ms. Sanchez and asked her if she lived at the location. Ms. Sanchez responded by stating that she was not going to answer the officer's questions.

19.     Defendant Ball ordered Ms. Sanchez to leave the property because he wrongly alleged that she was trespassing.

20.     Defendant Ball pulled out his handcuffs and ordered Ms. Sanchez to stand up so that he could place her under arrest even though she had committed no crime.

21.    Ms. Sanchez got up and moved away from the steps to sit on the hood of Ms. Umana's parked vehicle. As she walked to the car, she stated to Defendant Ball, "I don't know why you're bothering me."

22.    In response, Defendant Ball again wrongly alleged that Ms. Sanchez was trespassing, and he instructed her to use her phone to "google" the word "trespassing."

23.    Defendants Ball and Mihanda went into Plaintiffs' apartment building in order to attempt to find the involved dogs and knocked on their apartment door.

24.    While waiting for a response to their knock, Defendant Ball stated to Defendant Mihanda that he would have already opened Plaintiffs' apartment door if he had not been wearing a body camera, stating, "I used to open them all the time, oh yeah, trust me."

25.    After receiving no response, Defendants Ball and Mihanda decided to obtain the master key for the lock to Plaintiffs' apartment door from the maintenance office of the complex so that they could get inside.

26.    Defendant Ball stated to Defendant Mihanda, "now I'm going to be petty, call maintenance, stand by, have them go in the apartment, all because they don't want to answer questions."

27.    Defendants Ball and Mihanda went back outside of Plaintiffs' apartment building and flagged down a maintenance worker from the apartment complex.

28.    Defendant Ball requested that the maintenance worker retrieve the master key to Plaintiffs' apartment door. The worker soon returned with the key, and he gave it to Defendant Mihanda.

29.    While they waited for the maintenance worker, Defendant Ball stated to Defendant Mihanda, "something simple could have been handled easily. I mean, all she had to do was say

"here". Now rather than taking the dogs, you about to catch charges for something silly. But the Police are the bad guys, right?"

30.     Defendant Ball and/or Mihanda called Defendant Jackson to back them up at the apartment complex.

31.     Defendants Ball and Mihanda went back into Plaintiffs' apartment building and knocked on their door.

32.     After receiving no response again, Defendant Mihanda illegally opened Plaintiffs' apartment door by using the master key.

33.     Defendants Ball and Mihanda illegally entered Plaintiffs' apartment with their guns drawn.

34.     Defendant Jackson arrived moments later, and he followed Defendants Ball and Mihanda and illegally entered Plaintiffs' apartment. Notably, Defendant Jackson left his body camera unit in his police cruiser before entering Plaintiffs' apartment, in direct violation of the PGPD General Orders.

35.     Plaintiffs Dayri Benitez and Brandon Cuevas were inside their bedroom when the Officer Defendants illegally entered their apartment.

36.     Ms. Benitez and Mr. Cuevas heard Defendants Ball and Mihanda announcing themselves outside of the bedroom door. They called Ms. Umana and Ms. Sanchez on the phone and told them to come to the apartment because they believed that the police were inside.

37.     Ms. Benitez yelled to the officers through her bedroom door that they had no right to be inside their apartment and demanded to know if they had a warrant.

38.     Defendant Mihanda yelled back that they did not need a warrant because they had "probable cause".

39.     Defendant Ball then yelled to Ms. Benitez that "maintenance" had let them inside and advised her to, "take that issue with them."

40.     Ms. Benitez yelled back that the officers did not have probable cause.

41.     Ms. Sanchez then arrived at the apartment and walked inside past Defendant Jackson who was standing in the doorway.

42.     Defendant Ball saw that Ms. Sanchez had entered the apartment and he instructed her not to come inside.

43.     Defendant Ball then grabbed Ms. Sanchez and forcefully pushed her back into the hallway.

44.     Defendant Jackson then physically held the door shut to stop Ms. Sanchez from entering again.

45.     Ms. Umana then arrived at the apartment and began kicking the door and yelling that she lived there.

46.     Ms. Benitez came out of the bedroom with her hands up.

47.     Ms. Benitez again asked the officers why they were in her apartment.

48.     Defendant Mihanda grabbed Ms. Benitez, pulled her away from her bedroom door, and attempted to push her out of her own apartment into the hallway.

49.     Ms. Benitez yelled, "I'm calling 911!", "you don't have a warrant!", and "this is my house, why are you pushing me out!"

50.     Defendant Mihanda attempted to place Ms. Benitez in handcuffs by forcefully wrenching her left arm behind her back.

51.     Ms. Benitez continued to ask the officers why she was being arrested.

52.     Defendant Mihanda then yelled at Ms. Benitez, "I'm not the one, I'll knock you out!" as he pushed her into her kitchen and up on to the kitchen counter.

53.     Ms. Umana and Ms. Sanchez then squeezed through the apartment door past Defendant Jackson.

54.     Defendant Mihanda ordered Ms. Umana and Ms. Sanchez to go back into the hallway and stated, "you're about to get tased!"

55.     In response, Ms. Umana yelled, "yo, I live here!"

56.     Defendant Ball then yelled, "just put her [Ms. Umana] in cuffs."

57.     Defendant Jackson grabbed Ms. Umana by her arm and slammed her to the ground.

58.     Ms. Benitez yelled to Defendant Jackson that Ms. Umana's arm was broken and not to hold it, but he refused to listen.

59.     Ms. Umana also yelled to Defendant Jackson to let go of her arm because it had been recently broken, but he refused to listen and instead twisted her arm harder.

60.     Defendant Ball then threatened to throw Ms. Umana off her apartment balcony.

61.     Defendant Ball then pointed his taser at Ms. Umana's head and yelled, "hey, watch out, I'm going to tase her!"

62.     Hearing the commotion in the kitchen, Mr. Cuevas came out of the bedroom.

63.     As Mr. Cuevas opened the bedroom door, Ms. Umana's dog "Hennessy" hurried past Mr. Cuevas out of the bedroom and trotted down the hallway past Defendant Mihanda.

64.     Hennessy was moving towards her owner Ms. Umana, but Defendant Ball pulled Ms. Umana away from Hennessy's path.

65.     The Officer Defendants panicked and yelled, "dog, dog, get the dog!"

66.     Hennessey did not attack or lunge at any of the Officer Defendants.

67.     Suddenly, Defendant Jackson and Defendant Mihanda shot Hennessey in her back with their service weapons and Defendant Ball shot her with his taser.

68.     Ms. Sanchez attempted to care for Hennessy who was writhing in pain on the floor and bleeding all over the carpet and wall.

69.     Defendant Ball continued to threaten to tase Ms. Sanchez while she cared for the dying dog.

70.     Ms. Benitez called 911 on her phone and yelled, "I need police, 6908. Feds just came in my fucking house for no reason and shot my dog…why did the police break into my house?!"

71.     The Plaintiffs continued to question why the Officer Defendants had entered their home without a warrant and shot Hennessy. Defendant Ball responded, "that's what happens when you don't answer questions…when you live in an apartment and maintenance opens the door, that's how that works."

72.     The Officer Defendants placed Plaintiffs in handcuffs and took them into custody in PGPD vehicles and left them there for approximately one hour.

73.     Officer Defendants eventually let Plaintiffs go free because they had not committed any crime.

74.     Hennessy was taken to an animal hospital where she had to be euthanized because Defendants Mihanda and Jackson's bullets permanently paralyzed her.

75.     Defendant County offered to pay for the medical bills Ms. Umana incurred from Hennessy's care and euthanasia, but only in exchange for her promise not to speak out publicly about the home invasion and shooting. Ms. Umana declined the offer.

76.    When the media learned about this home invasion and dog shooting incident, PGPD Chief Aziz stated publicly that, "this incident will be thoroughly investigated."[1]

77.    PGPD initially placed Defendants Ball and Mihanda on paid administrative leave, however, after suspecting that they entered Plaintiffs' apartment without "authorization", PGPD suspended these two Defendants *with pay*, pending the review of the incident.

78.    PGPD placed Defendant Jackson on paid administrative leave pending the review of the incident.

79.    PGPD supervisors conducted Use of Force reviews of the actions of the Officer Defendants during this home invasion and dog shooting incident. These supervisors all concluded that the Officer Defendants had used appropriate police force during this incident, thereby ratifying their conduct.

80.    These supervisors completely ignored the fact that all the Officer Defendants' uses of police force during this incident were plainly unreasonable because they had illegally entered Plaintiffs' apartment in direct violation of the 4th Amendment, and they were illegally on the premises.

81.    PGPD Internal Affairs Sergeant Brian Layden performed an internal investigation into this incident. The subject of his investigation is listed in his report as "Unauthorized Entry & Discharge of Firearm (Domestic Canine)."

82.    During his investigation, Sgt. Layden interviewed Defendants Ball and Mihanda in August of 2021.

---

[1] https://www.wusa9.com/article/news/crime/prince-georges-county-police-officers-suspended-shooting-tasing-dog/65-67f7955d-5a6f-49b7-996d-aa720bc478be

83.    During Defendant Ball's interview, he told Sgt. Layden that he had entered Plaintiffs' apartment in order to determine if the dogs alleged to have been involved in the dog bite were in fact *a danger to their owners*. However, during Defendant Mihanda's interview, he contradicted Defendant Ball and told Sgt. Layden that they entered Plaintiffs' apartment simply to retrieve the dogs alleged to have been involved in the dog bite.

84.    During Defendant Mihanda's interview, he maintained his belief that he had "probable cause" to enter Plaintiffs' apartment without a warrant or any exception to the warrant requirement.

85.    As a result of Sgt. Layden's internal investigation, PGPD administratively charged Defendants Ball and Mihanda with "Conduct Unbecoming an Officer" for entering Plaintiffs' apartment without a warrant. However, they failed to include charges against the officers for breaking federal laws by violating Plaintiffs' 4th Amendment rights.

86.    Defendants Mihanda and Ball were found guilty by a PGPD trial board of Conduct Unbecoming an Officer in September and October of 2023 respectively.

87.    PGPD cleared Defendant Jackson of all Administrative charges.

88.    As a direct and proximate result of Defendants' actions illustrated above, Plaintiffs have suffered and will continue to suffer from mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

89.    Upon information and belief, Defendant County failed to adequately train, supervise, investigate, and/or discipline Officer Defendants at any point. Such failures directly and

proximately caused Plaintiffs the foreseeable injuries and damages they suffered and continue to suffer as alleged in this lawsuit.

90.     Upon information and belief, PGPD has a more than fifty-year custom of looking with a blind eye at instances of excessive force, unlawful searches and/or seizures, and police misconduct within their ranks in general. A sampling of such incidents includes:

a.     In the 1960's, the decade in which PGPD created an undercover "Death Squad," (which was tasked with entrapping and arresting Black people) at least two Black men were killed without legal justification, and another was seriously injured;

b.     In 1977, a PGPD officer unlawfully shot and killed an unarmed Black man over $14.00 worth of ham;

c.     In 1978, PGPD was put on notice, based on one of its officers interviews with the Washington Post, that it had a brutality issue in its ranks. Instead of addressing this issue, PGPD "encouraged" it;

d.     Also in 1978, PGPD was put on notice based on one of its officers' public statements, that it had a racism issue in its ranks, to the extent that the officer "wouldn't rule out [PGPD] police membership in the Klan";

e.     Also in 1978, PGPD officers handcuffed Terrence Johnson, a black 15-year-old boy, to a chair and then beat him;

f.     In 1989, PGPD officers beat Gregory Habib to death. In the same incident where the officers killed Mr. Habib, they broke Martin Habib's jaw, and cost the taxpayers $1,900,000.00 due to a jury verdict;

g.     In July of 1990, PGPD officers beat Kirk Simms, an elementary school guidance counselor. In November of 2000, a jury awarded him $900,000.00 for the violation of his rights.

One week prior to the Simms verdict, a different federal jury awarded a total of $300,000.00 to a group of twelve people who had also been illegally arrested by PGPD officers in 1995;

h.    In 1993, PGPD Officer Kevin Davis threw a man to the ground for no reason and a jury awarded the man $12,500.00. Instead of firing Davis, PGPD eventually promoted him to Deputy Chief in 2009;

i.    Also in 1993, PGPD officers searched Archie Elliott for weapons, handcuffed him behind his back, placed him in a police car, and then put the seatbelt on him. They then shot him 22 times, and as justification, they asserted that a weaponless Elliott somehow "wielded a gun" at them;

j.    In 1994, PGPD officers arrested a man without justification. That man happened to be a police officer from the District of Columbia;

k.    In 2016, PGPD officers illegally search, tackled, and punched in the face, another District of Columbia officer;

l.    In 2017, PGPD officers attacked and put to the ground another out of town police officer;

m.    In 1995, PGPD officers unleashed a police dog to maul Ricardo Mendez and Herra Cruz. The officer, Stephanie Mohr was federally indicted for civil rights violations, was convicted, and sent to prison;

n.    In 1997, PGPD officers ordered a police dog to attack Luis Azurdia. A resulting lawsuit was settled in 2002;

o.    Also in 1997, PGPD officers followed a Black man home, entered his house without consent or a warrant and pepper sprayed him. Other PGPD officers then sent a police dog to attack him and stomped him into the ground. Then, after ordering the man to crawl away, they

called him a "dumb nigger" and beat him with a metal stick to, in their words, "teach him for trying to run." During the beating, they repeatedly unleashed the dog to attack him. This cost the taxpayers $4,100,000.00 due to a jury verdict;

p.    In 1999, a PGPD officer shot Gary Hopkins, who was unarmed. The officer's report was flatly contradicted by numerous witnesses who alleged that the shooting was unprovoked. Although the officer was charged criminally, the State torpedoed the prosecution of the case by assigning an unprepared rookie prosecutor;

q.    In 2000, a PGPD officer stalked and killed Prince Jones, shooting at him 16 times, and hitting him 8 times in his back. The officer's report was flatly contradicted by numerous witnesses, but the State's Attorney who had never indicted an officer, refused to even present the case to a Grand Jury, let alone prosecute him. This cost the taxpayers $3,700,000.00 due to a jury verdict;

r.    In 2006, a PGPD officer shot and killed a man, which resulted in another lawsuit and settlement;

s.    In 2009, a PGPD officer slammed Javon Chestnut to the ground for no reason. A lawsuit was filed, but ultimately dismissed for reasons unrelated to the merits of the case;

t.    In 2010, PGPD officer hit Steven Morales with a closed fist, literally knocking him off his feet, then choked him. This cost the taxpayers $121,140.00 due to a jury verdict;

u.    Also in 2010, PGPD officers beat ten students for no reason. This cost the taxpayers $3,600,000.00 due to a jury verdict;

v.    In 2011, a PGPD officer punched a 13-year-old boy three times in the face, then pointed a gun at his head. The officer, Rickey Adey was charged, but acquitted;

15

w.    Also in 2011, PGPD lost *Espina, et al. v. Jackson, et al.*, Case No.: CAL09-23501 at trial, costing taxpayers $11,500,000.00 for yet another use of excessive police force;

x.    In 2013, PGPD settled *Johnson v. Prince George's County, Maryland, et al.*, Case No.: 8:10-cv-00582-DKC for yet another use of excessive police force;

y.    In 2014, a PGPD officer was indicted for assaulting a high schooler. This use of force was deemed excessive by PGPD Internal Affairs Division;

z.    Also in 2014, a PGPD officer was indicted for assaulting someone in handcuffs. This use of force was deemed excessive by PGPD Internal Affairs Division;

aa.    Also in 2014, a PGPD officer assaulted two citizens while they were handcuffed. This use of force was deemed excessive by PGPD Internal Affairs Division;

bb.    Also in 2014, a PGPD officer beat a child who was detained in a holding cell. This use of force was deemed excessive by PGPD Internal Affairs Division;

cc.    Also in 2014, a PGPD officer struck an innocent citizen in the head with a metal stick. This use of force was deemed excessive by PGPD Internal Affairs Division;

dd.    Also in 2014, a PGPD officer grabbed an innocent citizen by the hair and threw him headfirst into the ground, then after putting his knee into the victim's neck, handcuffed him, then picked him up by the hair and threw him into a wall. This use of force was deemed excessive by PGPD Internal Affairs Division;

ee.    Also in 2014, a PGPD officer punched and slapped someone in handcuffs and tried to cover up the use of force. This use of force was deemed excessive by PGPD Internal Affairs Division;

ff.    Also in 2014, a PGPD officer kicked and punched a detainee without justification or excuse. This use of force was deemed excessive by PGPD Internal Affairs Division;

gg.    Also in 2014, a PGPD officer slapped a detainee for not looking into his eyes during an interrogation. This use of force was deemed excessive by PGPD Internal Affairs Division;

hh.    In 2015, a PGPD officer was convicted for holding his gun to someone's head. This use of force was deemed excessive by PGPD Internal Affairs Division;

ii.    In 2015, PGPD lost *Butler v. Windsor, et al.*, Case No.: 8:13-cv-0883-PWG at trial for yet another use of excessive police force;

jj.    In 2016, PGPD settled *Anderson, v. Prince George's County, Maryland, et al.*, Case No.: 8:13-cv-01509-TDC for yet another use of excessive police force;

kk.    Also in 2016, PGPD settled *Canada-Malcolm v. Prince George's County, Maryland, et al.*, Case No.: 8:14-cv-02150-PJM for yet another use of excessive police force;

ll.    Also in 2016, PGPD settled *Ulloa v. Prince George's County, Maryland, et al.*, Case No.: 1:18-cv-00260-DKC for yet another use of excessive police force;

mm.    Also in 2016, PGPD lost *Jones v. Allen, et al.*, Case No.: 8:15-cv-01173-PX at trial for yet another use of excessive police force;

nn.    In 2016, a PGPD officer used his police car as a weapon to hit someone running away. The officer, Juan Hernandez was indicted and convicted for this incident;

oo.    Also in 2016, a PGPD officer woke up a sleeping homeless person, and then, because she was not fast enough, he picked her up by her ears, and slapped her in the face. He was convicted and sentenced to jail for his actions;

pp.    Also in 2016, a PGPD officer dragged a citizen off his own property. When the person's fiancée started recording the incident, the officer knocked her phone to the ground and

then picked him up by the back of his pants. This use of force was deemed excessive by PGPD Internal Affairs Division;

qq.    Also in 2016, a PGPD officer arrested a citizen for videotaping the arrest of someone else by tackling him to the ground for no reason. This use of force was deemed excessive by PGPD Internal Affairs Division;

rr.    In 2017, PGPD settled *Queen v. Prince George's County, Maryland, et al.*, Case No.: 8:14-cv-02941-PWG for yet another use of excessive police force;

ss.    Also in 2017, PGPD settled *Brown v. Cpl. Edwin Hernandez, et al.*, Case No.: 8:15-cv-03687-GJH for yet another use of excessive police force;

tt.    In 2017, PGPD officer William Bankhead punched Kevin Sneed several times, pulled him out of his car, and threw him to the ground for no reason. Then multiple officers began kicking and punching him, even though he was already handcuffed, and threatened to break his arm and murder him. Sneed suffered injuries to his right wrist as well as contusions and lacerations to his body. Despite the officers having not observed Sneed commit a crime and despite not finding any illegal items after searching his car, Ofc. Bankhead wrote a statement of charges against Sneed that resulted in Sneed being charged with Attempted Murder, 1st Degree Assault, and Resisting Arrest. Ofc. Bankhead also charged Sneed with various firearms charges, even though no firearm was recovered from Sneed or his vehicle. On May 1, 2019, Sneed was acquitted of all charges. Sneed subsequently filed suit against the officers and the County in the Circuit Court for Prince George's County, and he was awarded a settlement by Defendant County in 2022;

uu.    Also in 2017, a PGPD officer put a gun to a detainee's head for no reason. This use of force was deemed excessive by PGPD Internal Affairs Division;

vv.    Also in 2017, a PGPD officer hit a citizen with his car because he would not consent to a search of his person. This use of force was deemed excessive by PGPD Internal Affairs Division;

ww.    In 2018, PGPD settled *Goines v. Prince George's County*, Case No.: 8:16-cv-00463-RWT for yet another use of excessive police force;

xx.    In 2018, a PGPD officer raped a woman he pulled over, and is awaiting a criminal trial;

yy.    Also in 2018, PGPD officers arrested Andre Verdier, cuffed him, and put him in a police car. Corporal Stephen Downey, upon realizing that particular police car did not have a camera inside, punched Mr. Verdier in the head multiple times for no reason, then falsely charged him with crimes. After those were dismissed, Mr. Downey was charged with assault and convicted and sent to jail;

zz.    Also in 2018, a PGPD officer punched an arrestee who was already secured. This use of force was deemed excessive by PGPD Internal Affairs Division;

aaa.    Also in 2018, a PGPD officer punched an arrestee twice in the face even though he was already handcuffed. This use of force was deemed excessive by PGPD Internal Affairs Division;

bbb.    Also in 2018, PGPD lost *Rafael Holbrook, et al., v. Officer Khalid Rasuli, et al*, Case No.: CAL16-36619 at trial and cost taxpayers $641,000.00 for yet another use of excessive police force;

ccc.    In 2019, PGPD Cpl. Bryant Strong aggressively handled Demonte Ward-Blake during a routine traffic stop, and an argument ensued between the two men. When Cpl. Strong got fed up with Mr. Ward-Blakes' protest, he slammed Mr. Ward-Blake on his face in the street while

his hands were cuffed behind his back. Cpl. Strong broke Mr. Ward-Blake's nose and neck and paralyzed him permanently from the chest down. Defendant County settled Mr. Ward-Blake's claims of excessive force in the amount of $7.5 million;

ddd.  In 2020, PGPD settled *Jacobs v. Bd. Educ. of Prince George's County, et al.*, Case No.: 8:17-cv-00678-PWG for yet another use of excessive police force;

eee.  Also in 2020, PGPD settled *Whitefield v. Prince George's County, Maryland, et al.*, Case No.: 8:19-cv-03000-TDC for yet another use of excessive police force;

fff.  From January of 2019 to January of 2020, PGPD Cpl. Michael Owen used excessive force against County citizens Jonathan Harris, Devonne Gaillard, Demetrice Patterson, and Jerry Costen, Sr., culminating with Owen shooting and killing William H. Green on January 27, 2020, who was handcuffed behind his back and locked inside Owens police cruiser. Owen was immediately charged with 2nd Degree Murder, was held without bail as a danger to the community and is scheduled to proceed to trial on November 27, 2023. Defendant Prince George's County settled Mr. Green's excessive force claim for $20 million in September of 2020. Defendant County also collectively settled Mr. Harris, Mr. Gaillard, Mr. Patterson, and Mr. Costen's claims for over $1 million in June of 2023.

91.  Upon information and belief, including but not exclusively limited to the fact that numerous PGPD officers accused the department of retaliation against those officers who report misconduct of other officers, especially when a minority officer reports the misconduct of a white officer, PGPD has a custom of permitting and promoting racial violence against its citizens.

92.  Upon information and belief, including but not exclusively limited to the fact that PGPD Officer Thomas Boone, while in the position of Assistant Commander of PGPD District 2, publicly admitted that PGPD has continually operated under a pattern and practice of failing to

properly investigate complaints and/or failing to complete investigations into allegations of misconduct against its officers by citizens, PGPD has a pattern and practice of failing to properly investigate complaints and/or failing to complete investigations into allegations of misconduct against its officers by citizens, and PGPD officer are aware of this fact.

93.    Upon information and belief, including but not exclusively limited to public record correspondences of the PGPD, PGPD ranking officers created a quota system under former Chief Hank Stawinski's command to incentivize officers to conduct more citizen contacts, dismissing officers who failed to deliver productivity stats, despite the known illegality of quotas.

94.    In October 2000, the DOJ initiated a pattern and practice investigation regarding use of excessive force throughout the PGPD and concluded that an unconstitutional pattern of excessive force pervaded their ranks. This investigation resulted in the County and Department entering a "Memorandum of Agreement" with the Department of Justice in January 2004. Pursuant to the Memorandum of Agreement, the Department was required to overhaul its use of force and reporting protocols, including review of use of force, its officer training, its processes for reviewing and tracking other officer misconduct allegations, and enhancing its "early identification system" to record all uses of force, all complaints, and all disciplinary actions taken against officers.

95.    Upon information and belief, including but not exclusively limited to the fact that PGPD discontinued racial bias training of its officers under Chief Stawinski's command, despite having knowledge of text messages between white PGPD officers during a call for service which stated, *"We ought to bring back public hangings"* and images that captured a training dummy that Caucasian officers donned with an afro wig and black face, PGPD leadership has persistently and systemically failed to enforce its policies regarding civilian interactions, particularly complaints of racial bias by its officers.

96.     Upon information and belief, including but not exclusively limited to the fact that PGPD Majors Mills, Mints, and Weaver, among other PGPD Commanders, never reviewed any of the use of force incident reports arising under their commands during the years 2016 to 2019, there was widespread non-compliance between the years 2016 and 2019 with PGPD departmental policy mandating a final command review by supervisor officers of all use of force incident reports as required by PGPD General Order Volume II, Chapter 57. Therefore, the goals of that Order, to assess, among other things, whether officers are properly trained in use of force techniques and whether their use of force was within Departmental guidelines, were internally sabotaged.

97.     Upon information and belief, including but not exclusively limited to the fact that from 2016-2019, PGPD reviewed 1,219 uses of force reports (and in each and every instance, including but not limited to those discussed *supra*, PGPD commanders determined no unreasonable force occurred) and in that same timeframe, 6,805 uses of force occurred, PGPD ignored its reporting policies and procedures regarding use of force.

98.     Upon information and belief, including but not exclusively limited to the fact that from 2016-2019 only 0.2 percent of the 6,805 uses of force were deemed "unjustified," and Internal Affairs only investigated a third of the unjustified uses of force, PGPD had and still has a custom of not investigating uses of force.

99.     PGPD's Early Identification System Policy is codified in the PGPD General Orders Volume I, Chapter 14, which identifies the policy as "an integral part of the Department's police-community relations strategy" and advises that the policy "…benefits the public by minimizing the number of police employees who may be at risk for future disciplinary actions." PGPD was required to use this data to manage risk and liability and to evaluate the performance of all officers specifically on whether their uses of force were reasonable and lawful.

100.    Under the policy, the Commander of the Internal Affairs Division is required to prepare a series of monthly and quarterly reports allowing a systemic review of significant events such as complaints and uses of force. The monthly reports are required to identify all officers who have been the subject of a combination of two or more uses of force or complaints within a 60-day period. The quarterly reports are required to identify all officers who have been the subject of a combination of three or more uses of force or complaints in a three-month period, or two complaints during that period.

101.    Under the Policy, when an officer is identified on either report, the officer's Commander, their Captain, their Lieutenant, and their direct supervisor are required to "personally meet with the subject employee," and the Commander is required to "respond back to the Chief of Police in writing, indicating the date and time of the interview, as well as the participants and results" including "their assessment and any intervention action taken." If no intervention is taken, the Commander . . . must articulate specific reasons for not taking action." Untimely reporting or the failure to report information impedes the purpose of the Department's policy of identifying "police employees who may be at risk for future disciplinary actions."

102.    Despite the federal mandate, PGPD has failed to meet its duty to screen out officers that the Department knew presented a clear risk of harm to County citizens, because the Policy in practice does not assess the effectiveness of the "command review" to determine whether it detects excessive uses of force by PGPD officers, and the Policy allows Commanders to ignore patterns of unreasonable use of force or discrimination employed by an officer whose force is being reviewed in making an evaluation.

103.    Instead, the required monthly reports prepared by PGPD Internal Affairs Division pursuant to the Policy do not identify officers who are the subject of two or more uses of force or

complaints within a 60-day period as prescribed. Rather, the reports only identify officers who had two uses of force within a calendar month, thereby only capturing a fraction of the officers the system was designed to flag.

104.    Additionally, when PGPD Commander Mills took the helm of the Internal Affairs Division in 2015, she stopped producing the required quarterly reports altogether.

105.    Former PGPD Chief Stawinski's testified under oath that even when officers were flagged and evaluated under his command, their Commanders would not report back to him with the result as required by the Early Identification System Policy. PGPD ranking officers' refusal to adhere to their own policy undermined the very purpose of the reporting system by failing to identify officers who PGPD leaders knew, or should have known, through their own training, knowledge, and experience would likely violate community members.

106.    As a direct and proximate result of PGPD's widespread tolerance, encouragement, and condonation of PGPD officers using excessive force, committing unlawful searches and/or seizures, and committing police misconduct, Officer Defendants were empowered and emboldened to illegally enter Plaintiffs' apartment, commit acts of excessive force against them, falsely arrest Plaintiffs, and unnecessarily shoot and kill Plaintiff Umana's dog Hennessy.

## CAUSES OF ACTION

### COUNT I

**42 U.S.C. §1983**
**Unconstitutional Custom, Pattern, Practice of Condoning**
**Unlawful Searches & Seizures, Excessive Use of Force,**
**and Improper Use of Police Powers**
**(*Monell* Claim)**

**(Plaintiffs against Defendant County)**

107.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

108.    Plaintiffs sue Defendants under 42 U.S.C. § 1983, a civil rights law passed by Congress that provides a remedy for persons who have been deprived of their federal constitutional rights under color of state law.

109.    At all relevant times herein, Defendant County was a state actor and a "person" within the meaning of 42 U.S.C. § 1983 and its conduct was and is subject to 42 U.S.C. § 1983.

110.    At all relevant times herein, Plaintiffs had rights under the Fourth and Fourteenth Amendments not to have their person, property, and/or their domicile unlawfully searched and/or seized in an unreasonable manner by any state actor, not to be deprived of their liberty without due process of law by any state actor, not to be summarily punished by any state actor, and not to be subjected to the use of unreasonable and excessive police force.

111.    As described *supra*, PGPD sworn police officers have persistently engaged in a widespread practice of unconstitutional conduct of unlawfully searching and/or seizing and/or using excessive force against citizens. It was of such a duration and frequency as of June 2, 2021, such that it had become customary and standard operating procedure among PGPD's police officers, and Defendant County knew or should have known of the widespread violations.

112.    It was clearly established by June 2, 2021, that Defendant County's pattern and practice of condoning the widespread commission of unlawful searches and/or seizures, the use of excessive force, and the commission of police misconduct by its police officers as described *supra* violated the Fourth and Fourteenth Amendments to the U.S. Constitution.

113.    As described *supra*, Officer Defendants, while acting under color of state law, deprived Plaintiffs of their clearly established and well-settled rights under the Fourth and Fourteenth Amendment of the U.S. Constitution not to have their property and/or domicile

unlawfully search and/or seized, not to be deprived of liberty without due process of law, not to be summarily punished, and not to be subjected to the use of unreasonable and excessive force.

114.    As alleged herein, the actions of Officer Defendants were objectively unreasonable, excessive, absent any lawful justification and/or excuse, and were in keeping with the unlawful pattern practice, policy and/or custom of condoning the same by Defendant County.

115.    Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendant County is prohibited from causing, allowing, enabling, and/or facilitating its officers to engage in a pattern, practice, policy, or custom of violating citizens' constitutional rights and is obligated to train and supervise its officers in the recognition and handling of incidents of misuse of police powers and rights violations committed by Defendant County's police officers, as well as recognizing patterns of systemic perpetuation of the same.

116.    By establishing, executing, implementing, enforcing, directing, maintaining and/or controlling polices, customs, practices, usages, and procedures to be used by PGPD officials and officers, as set forth supra, Defendant County, while acting under color of law, engaged in a pattern and practice of unconstitutional municipal conduct.

117.    Defendant County established and maintained a pattern, practice, policy, or custom of allowing, condoning, enabling, and/or facilitating its officers to use excessive and unlawful force in connection with subduing and/or apprehending individuals. Defendant County has also engaged in a pattern, practice, policy, or custom of allowing, condoning, enabling, and/or facilitating its officers to conduct unlawful searches and/or seizures and has permitted officers to commit further unlawful uses of various types of police force and misconduct.

118.    As identified *supra*, at all relevant times, the County maintained a custom, policy, and/or practice of condoning officers' conduct in knowingly, consciously, and repeatedly failing

to stop or correct the widespread pattern of unconstitutional uses of force, searches, and/or seizures.

119.    Defendant County as described *supra*, with specific intent or deliberate indifference, failed to correct and/or otherwise hold PGPD police officers accountable for their abuses of police powers, unlawful searches and/or seizures, and continued and repeated unconstitutional uses of force and unlawful searches and/or seizures.

120.    Officer Defendants' violations of Plaintiffs described *supra* resulted from Defendant County's failure to correct their officers' pervasive constitutional violations. Thereby, Defendant County committed an independent violation of Section §1983 against Plaintiffs by condoning the pattern and practice of unconstitutional use of force, unlawful searches and/or seizures, and abuse of police powers by its officers, including Officer Defendants.

121.    Defendant County acted with reckless disregard for and/or with deliberate indifference to whether Plaintiffs' rights would be violated by its actions and/or omissions and that such actions and/or omissions were a proximate cause of Officer Defendants violating Plaintiffs' constitutional rights.

122.    Defendant County's failure to correct the widespread uses by its police officers of excessive force, unlawful searches and/or seizures, and police misconduct created an unreasonable risk of 4th Amendment violations being committed by its police officers against County citizens and Plaintiffs. Defendant County knew or should have known that this unreasonable risk of 4th Amendment violations existed, but they ignored this risk with deliberate indifference for the consequences.

123.    As a direct and proximate result of Defendants County's actions or omissions identified herein, Plaintiffs sustained significant physical, emotional, mental, and financial

injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs requests that this Court enter judgment in their favor and against Defendant County, in excess of $16,000,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, and any other such relief that this Court deems just and proper and any further relief as the nature of the case may require.

### COUNT II

**42 U.S.C. §1983**
**Unconstitutional Custom, Pattern and/or Practice of**
**Failure to Train, Supervise, and/or Discipline**
**(*Monell* Claim)**

**(Plaintiffs against Defendant County)**

124.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

125.    Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendant is prohibited from allowing, condoning, enabling, and facilitating the Department's officers to engage in a pattern, practice, policy or custom of violating citizens' constitutional rights and is obligated to train and supervise officers in the recognition and prevention of incidents of corruption, misuse of police powers, and rights violations committed by the Department's officers, as well as recognizing patterns of systemic perpetuation of same.

126.    As alleged herein, Defendant County engaged in a pattern, practice, policy, and/or custom of condoning incidents of PGPD illegally searching and/or seizing citizens and/or using

excessive and unlawful force in connection with seizing, subduing and/or apprehending individuals.

127.    As identified *supra*, the training, supervision, and oversight promulgated by Defendant County regarding incidents of misuse of police powers, and rights violations committed by Defendant County's officers was inadequate, insufficient, or nonexistent, and Defendant County, directly and through its employees, agents and officers, failed to adequately train, supervise and discipline its employees, agents, and officers under its direction and control.

128.    The County's final policy making officials, ranking officers, and supervisors had actual or constructive knowledge of the pervasive and persistent pattern and practice that its officers were engaged in, that their conduct violated clearly established rights, and that this conduct posed an unreasonable risk of constitutional injury to its citizens in general.

129.    Defendant County failed to properly handle the recurring instances of constitutional violations, and it failed to adequately supervise and discipline its police officers. Defendant County's failure to adequately train and supervise further articulates the aforementioned unconstitutional pattern and practice. As alleged herein, Defendant County engaged in a pattern, practice, policy, or custom of condoning Defendant County's officers use of excessive and unlawful force, conduct illegal seizures and/or seizures, and improperly using their police powers.

130.    Defendant County knew that it was highly probable and predictable that the use of excessive force, unlawful searches and/or seizures, and the improper use of police powers would occur without adequate training, supervision and/or discipline of its police officers because there was a pattern of similar constitutional violations known within the PGPD. It was foreseeable and highly predictable that failing to properly train, discipline, and/or supervise Officer Defendants in the proper use of force, the parameters of the 4th amendment, the handling of incidents of

corruption, misuse of police powers, and civil rights violations would, and in fact did, result in the violation of Plaintiffs' constitutional rights as alleged herein and Defendant County was deliberately indifferent to same.

131.    Despite this knowledge, Defendant County, with deliberate indifference to the consequences, took no action to prevent or remedy the illegal conduct of PGPD police officers. Defendant County routinely failed to supervise and discipline PGPD officers, thus allowing the misconduct to continue and thrive.

132.    As alleged herein, the actions taken by Officer Defendants against Plaintiffs were unreasonable, excessive, absent any lawful justification and/or excuse, and were a direct result of Defendant County's failure to adequately train, supervise, oversee, and discipline its employees as it relates to the proper use of police force and the parameters of the 4th Amendment. Defendant County's failure to properly train, oversee, supervise, and discipline its employees was tantamount to deliberate indifference.

133.    As alleged herein, the actions by Officer Defendants were objectively unreasonable, excessive, absent any lawful justification and/or excuse, and were in keeping with the pattern practice, police and/or custom of the Defendant County.

134.    Defendant County subjected Plaintiffs to these deprivations of their rights maliciously and/or acting with reckless disregard for and/or with deliberate indifference to whether Plaintiffs' rights would be violated by its actions and that such actions were the moving force in his having such rights violated and incurring his injuries. Defendant County's actions and/or omissions as described herein, were intentional, wanton, willful, malicious, and/or manifested blatant and reckless disregard for Plaintiffs' constitutionally protected rights, and as such Plaintiffs are entitled to compensatory damages from Defendant County.

135.    As a direct and proximate result of Defendant County's actions and/or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs requests that this Court enter judgment in their favor and against Defendant County, in excess of $16,000,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, and any other such relief that this Court deems just and proper and any further relief as the nature of the case may require.

## COUNT III

**42 U.S.C. §1983**
**Excessive Force, Unlawful Search & Seizure**
**False Arrest, & Improper Use of Police Powers**

**(Plaintiffs against Officer Defendants)**

136.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

137.    At all times relevant to this Complaint, Officer Defendants were acting under the color of state law as sworn police officers employed by Defendant County.

138.    Under the Fourth and Fourteenth Amendments to the United States Constitution, Officer Defendants were prohibited from using excessive force against Plaintiffs, from unreasonably seizing and searching Plaintiffs' property and/or domicile, from falsely arresting Plaintiffs, and from committing acts of police misconduct against Plaintiffs.

139.    The actions of Officer Defendants as detailed herein constitute excessive force, unlawful search and seizure, false arrest, and acts of police misconduct in gross violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution and the guarantees set forth in 42 U.S.C. §1983.

140.    Plaintiffs did not pose any threat to the safety of the officers or to anyone else, were not armed, were not resisting lawful arrest, and were not attempting to flee a lawful apprehension at the time Officer Defendants violated their 4th Amendment rights.

141.    The force used by Officer Defendants was intentional, excessive, objectively unreasonable, absent any lawful justification or excuse, unconstitutional, and unlawful force in the restraint and/or apprehension of Plaintiffs.

142.    Officer Defendants illegally entered Plaintiffs' domicile without a warrant and without the existence of any exception to the warrant requirement in direct violation of Plaintiffs' 4th Amendment rights.

143.    Officer Defendants' conduct violated Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, false arrest, and the use of excessive force, and those rights were clearly established at the time of the violation.

144.    Officer Defendants' actions or omissions as described herein, were intentional, wanton, willful, malicious, manifestly blatant, callous, and in reckless disregard for Plaintiffs' constitutionally protected rights, and as such they are entitled to compensatory and punitive damages from Officer Defendants, individually.

145.    As a direct and proximate result of Officer Defendants' actions and/or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic

stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Officer Defendants jointly and severally in an amount in excess of $16,000,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT IV

### 42 U.S.C. §1983
### Failure to Intervene
### (Plaintiffs against Officer Defendants)

146.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs.

147.    As described supra, Defendant Ball, Defendant Mihanda, and Defendant Jackson each independently violated Plaintiffs' 4th Amendment rights by unlawfully searching and/or seizing Plaintiffs' property and/or domicile, using excessive and unreasonable force against Plaintiffs, and falsely arresting Plaintiffs.

148.    Officer Defendants had a sworn duty to intervene to prevent their fellow police officers from violating the 4th Amendment rights of Plaintiffs.

149.    Each Officer Defendant had a reasonable opportunity to intervene to prevent their fellow police officers from violating the 4th Amendment rights of Plaintiffs.

150.    Each Officer Defendant failed to intervene in any manner to prevent their fellow police officers from violating the 4th Amendment rights of Plaintiffs.

151.    As a direct and proximate result of Officer Defendants' failure to intervene, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Officer Defendants jointly and severally in an amount in excess of $16,000,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT V

### Maryland Declaration of Rights Article 24:
### Deprivation of Liberty and Property & Excessive Force

### (Plaintiffs against Defendants)

152.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

153.    At all times relevant to this Complaint Officer Defendants were acting under the color of state law as officers employed by Defendant County.

154.    Officer Defendants violated Plaintiffs' civil rights and due process as set forth in the Maryland State Constitution and the Declaration of Rights, including Article 24.

155.    Officer Defendants violated Plaintiffs' civil rights and due process as set forth in the Maryland Declaration of Rights, including Defendants' intentional acts of misconduct, unlawful entry, false arrest, excessive force, and false imprisonment.

156.    The unlawful acts committed by Officer Defendants were intentional, excessive, objectively unreasonable, absent any lawful justification or excuse, unconstitutional, and unlawful force in the restraint and/or apprehension of Plaintiffs.

157.    Officer Defendants' conduct was without legal justification and was improperly motivated by ill will and actual malice. Officer Defendants intended to harm Plaintiffs when they violated Plaintiffs' civil rights and due process under the Maryland Declaration of Rights.

158.    Plaintiffs did not have the freedom to leave during their unlawful detention and arrest.

159.    Officer Defendants conduct was objectively unreasonable in light of the facts and circumstances that confronted them.

160.    Defendant County is vicariously liable to Plaintiffs for Officer Defendants' violations of Plaintiffs' rights under Article 24 of the Maryland Declaration of Rights.

161.    Officer Defendants' actions and/or omissions as described herein, were intentional, wanton, willful, malicious, manifested blatant and reckless disregard for Plaintiffs' constitutionally protected rights, and as such they are entitled to compensatory and punitive damages from Defendants individually.

162.    As a direct and proximate result of Defendants' actions and/or omissions identified herein, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants jointly and severally in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT VI

### Assault & Battery

### (Plaintiffs against Defendants)

163.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

164.    At all times relevant to this Complaint, Officer Defendants were acting under the color of state law as police officers employed by Defendant County.

165.    Officer Defendants assaulted and battered Plaintiffs when they unlawfully seized and arrested Plaintiffs after illegally entering Plaintiffs' domicile without a warrant or any exception to the 4th Amendment warrant requirement.

166.    Officer Defendants' actions raised in Plaintiffs' minds an apprehension of imminent bodily harm when they unlawfully seized and arrested Plaintiffs.

167.    Plaintiffs were threatened by Officer Defendants who had possessed the apparent present ability to carry out the threat of assaulting and battering Plaintiffs.

168.    Officer Defendants intentionally touched Plaintiffs in a harmful or offensive manner when they unlawfully seized and arrested Plaintiffs. Plaintiffs did not give Officer Defendants permission to touch them in that or any other manner, and no legal excuse existed to justify Officer Defendants offensive touching of Plaintiffs.

169.    Officer Defendants' conduct was intentional. Officer Defendants acted as the County's agent, servant, and/or employee when they assaulted and battered Plaintiffs.

170.    Officer Defendants' conduct was committed within the scope of their employment with Defendant County, thus Defendant County is vicariously liable for their tortious actions committed against Plaintiffs.

171.    As a direct and proximate result of Officer Defendants' offensive touching of Plaintiffs, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants jointly and severally in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT VII

### Negligence

### (Plaintiffs against Defendant County)

172.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

173.    At all times relevant to this Complaint Defendant County was acting under the color of state law.

174.     Defendant County owed Plaintiffs a duty to exercise due care in the daily operation of its police department to avoid causing unreasonable yet foreseeable physical and/or mental injury to Plaintiffs.

175.     Defendant County breached these duties to Plaintiffs by its actions and inactions noted throughout this Complaint.

176.     Defendant County's negligence proximately caused the injuries that Plaintiffs sustained. All of Plaintiffs' injuries were caused solely by the negligence of Defendant County without any contributory negligence by Plaintiffs.

177.     As a result of Defendant County's negligence, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant County in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT VIII

### Gross Negligence

### (Plaintiffs against Defendants)

178.     Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

179.    At all times relevant, Officer Defendants were acting under the color of state law as police officers employed by Defendant County. Each Officer Defendant had a duty to act in the manner that an objectively reasonable and prudent police officer would when faced with the same circumstances then confronting them.

180.    Officer Defendants engaged in intentional, willful, and wanton misconduct and with a reckless disregard for the consequences to Plaintiffs, their domicile, and their respective personal property. Officer Defendants acted with recklessness towards Plaintiffs rights and wellbeing.

181.    Officer Defendants' gross negligence proximately caused the damages that Plaintiffs sustained. All of Plaintiffs damages were caused solely by the gross negligence of Officer Defendants without any contributory negligence by Plaintiffs.

182.    Officer Defendants' conduct was without legal justification and was improperly motivated by a reckless disregard for the consequences to Plaintiffs. Officer Defendants intended to harm Plaintiffs and Plaintiff Umana's dog Hennessy when they unlawfully entered Plaintiffs' domicile, illegally seized and arrested Plaintiffs without legal justification, and shot or tased Plaintiff Umana's pet dog, Hennessy.

183.    Officer Defendants' conduct was committed within the scope of their employment with Defendant County; thus Defendant County is vicariously liable for their tortious actions committed against Plaintiffs.

184.    As a result of Officer Defendants' gross negligence, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss

of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants jointly and severally in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT IX

### Negligent Hiring, Training, and Supervision

### (Plaintiffs against Defendant County)

185.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

186.    At all times relevant to this Complaint, Officer Defendants were acting under the color of state law as police officers employed by Defendant County.

187.    Defendant County maintained a duty to use reasonable care in hiring, training, and supervising individuals competent and fit to perform the duties of a PGPD police officer.

188.    Defendant County knew or should have known that Officer Defendants proved unfit for their assigned duties. Defendant County is obligated to train and supervise officers in the recognition and handling of incidents of corruption, misuse of police powers such as the use of excessive force, and rights violations committed by Defendant County's officers, as well as recognizing patterns of systemic perpetuation of same.

189.    At all relevant times, Defendant County, directly and through its officers and agents had an obligation to ensure that its officers, employees, and agents, exercised the same degree of care that a reasonable and prudent person would exercise in the same or similar situation with

respect to the training, supervision, and oversight of all employees, agents, and officers under its direction and control.

190.    As identified supra, Officer Defendants' conduct on June 2, 2021, rendered them incompetent to provide law enforcement.

191.    As identified supra, the training, supervision, and oversight required by Defendant County regarding incidents of misuse of police powers, and rights violations committed by Defendant County's officers was inadequate, insufficient, or nonexistent, and Defendant County, directly and through its employees, agents and officers, failed to exercise the above requisite degree of care in the supervision of all employees, agents, and officers under its direction and control, including Officer Defendants.

192.    Defendant County had actual or constructive knowledge of the pervasive and persistent pattern and practice in which its officers were engaged that violated clearly established civil rights, and that this conduct posed an unreasonable risk of constitutional injury to County citizens and Plaintiffs. Defendant County knew or should have known of Officer Defendants' incompetence.

193.    In spite of this knowledge, Defendant County took no adequate action to prevent or remedy the misconduct by PGPD police officers. It was deliberately indifferent to the persistent constitutional violations by PGPD officers whom it directly supervised. In breach of its duties, Defendant County routinely failed to supervise and discipline Officer Defendants and other PGPD officers, thus allowing the misconduct to continue and thrive.

194.    Defendant County knew or should have known that Officer Defendants would come into contact with the public. By virtue of Defendant County's negligent hiring, training, and

supervision, the risk that Officer Defendants would violate the constitutional rights of Plaintiffs was foreseeable.

195.    Defendant County failed to properly supervise Officer Defendants and other employees in the proper handling of incidents of corruption, misuse of police powers, and rights violation committed by Defendant PGPD's officers.

196.    It was foreseeable that by failing to properly train and supervise PGPD officers, including Officer Defendants, in the proper handling of incidents of corruption, misuse of police powers, and rights violations that Officer Defendants would, and in fact did, violate Plaintiffs' constitutional rights as alleged herein and Defendant County was indifferent to same.

197.    As a direct and proximate result of Defendant County's actions and/or omissions Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendant County in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT X

### False Imprisonment & Arrest

### (Plaintiffs against Defendants)

198.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

199.    As described supra, Officer Defendants intentionally caused Plaintiffs to be falsely imprisoned and arrested when they intentionally deprived Plaintiffs of their liberty without legal justification.

200.    Plaintiffs did not consent to Officer Defendants deprivation of their liberty, and no warrant existed to justify their false imprisonment and arrest.

201.    Officer Defendants falsely imprisoned and arrested Plaintiffs with malice and/or gross negligence.

202.    No probable cause existed to justify Officer Defendants' false imprisonment and arrest of Plaintiffs because Plaintiffs had committed no crimes.

203.    Officer Defendants knew that Plaintiffs had committed no crimes because they were unable to charge Plaintiffs with any crimes.

204.    Officer Defendants' conduct was committed within the scope of their employment with Defendant County; thus, Defendant County is vicariously liable for their tortious actions committed against Plaintiffs.

205.    As a direct and proximate result of Officer Defendants' false imprisonment and arrest of Plaintiffs, Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to discomfort, annoyance, mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants jointly and severally in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other

such relief that this Court deems just and proper and further relief as the nature of the case may require.

## COUNT XI

### Trespass to Real Property

### (Plaintiffs against Defendants)

206.    Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

207.    As stated *supra*, Officer Defendants intentionally entered Plaintiffs' domicile without authority, privilege, or permission from Plaintiffs or any legal justification. Plaintiffs did not consent to Officer Defendants' entry into their domicile.

208.    Officer Defendants' trespass of Plaintiffs' domicile was an intentional intrusion and/or interference to Plaintiffs' possessory interest of their domicile.

209.    Upon their trespass of Plaintiffs' domicile, Defendant Mihanda or Defendant Jackson shot a bullet through the floor of Plaintiffs' domicile.

210.    Officer Defendants' trespass of Plaintiffs' domicile was committed within the scope of their employment with Defendant County; thus, Defendant County is vicariously liable for their tortious actions committed against Plaintiffs.

211.    As a direct and proximate result of Officer Defendants' trespass of Plaintiffs' domicile, Officer Defendants killed Plaintiff Umana's dog, Plaintiffs were caused to vacate their domicile, and Plaintiffs sustained physical, emotional, mental, and financial injuries, including, but not limited to mental anguish, emotional pain and suffering, mental stress, post-traumatic stress, depression, anxiety, panic attacks, unexpressed anger, shame, loss of dignity, loss of self-respect, embarrassment, loss of sleep, loss of quality of life, and fear for loss of life, as well as medical expenses, legal fees, and other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Defendants jointly and severally in an amount in excess of $75,000.00 in compensatory damages, specific amount to be determined at trial, plus costs and interest, punitive damages, and any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

## REQUEST FOR RELIEF

**WHEREFORE**, as to each and every count pled, Plaintiffs respectfully request that this court award them:

A. Judgment in favor of each Plaintiff and against Defendants, individually and/or jointly and severally, finding Defendants liable to Plaintiffs;

B. Compensatory damages in an amount which exceeds:

    a. $16,000,000.00, specific amount to be determined at trial, plus interest and costs as to Counts I through IV;

    b. $75,000,00, specific amount to be determined at trial, plus interest and costs as to Counts V through XI;

C. Reimbursement to each Plaintiff of all costs paid by each Plaintiff or on behalf of each Plaintiff in connection with the incident in an amount to be determined at trial;

D. Reimbursement to each Plaintiffs for the costs and expenses of this case, including attorneys' fees;

E. Pre-judgement and post-judgement interest;

F. Punitive damages against Defendants Ball, Mihanda, and/or Jackson, in an amount to be determined at trial;

G. An order enjoining Defendant County and its agents and/or employees from engaging in the deprivation of citizens 4th Amendment rights;

H. A further order requiring Defendant County to implement rigorous mandatory constitutional rights training for its police force so that they can effectively recognize, understand, and abide by the tenets of the United States' constitution;

I. A further order requiring Defendant County to develop and implement a mandatory personal development training module for its police force with Mr. A.J. Ali, founder of L.O.V.E is the Answer (Learn, Open, Volunteer, Empower), an innovative workshop for improving police-community relations.[2]

J. A further order requiring Defendant County to terminate their employment of Defendants Ball, Mihanda, and Jackson for cause as sworn police officers of PGPD.

K. Any other such relief that this Court deems just and proper and further relief as the nature of the case may require.

Dated: November 27, 2023

Respectfully submitted,

MURPHY, FALCON & MURPHY

By: /s/ Malcolm P. Ruff
William H. Murphy, Jr. (Bar # 07985)
Malcolm Ruff (Bar # 21595)
One South Street, Suite 3000
Baltimore, MD 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
billy.murphy@murphyfalcon.com
malcolm.ruff@murphyfalcon.com
*Attorneys for Plaintiffs*

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on the issues set forth in this Complaint.

/s/ Malcolm P. Ruff
Malcolm P. Ruff (Bar # 21595)

---

[2] https://loveistheanswermovement.com/workshops/